**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>**William J. Carey**</u>

    **v.**                                                    Case No. 05-cv-274-PB
                                                                          Opinion No. 2007 DNH 105
<u>**Hillsborough County**</u>
<u>**Department of Corrections, et al.**</u>


<u>**MEMORANDUM AND ORDER**</u>

     William Carey brings this action pursuant to 42 U.S.C. § 1983 against the Hillsborough County Department of Corrections ("HCDOC"), HCDOC Superintendent James M. O'Mara, Jr., and Roland St. Onge, D.D.S. ("Dr. St. Onge") to recover for injuries sustained during his pretrial detention. Carey alleges that defendants violated his Eighth Amendment rights by failing to protect him from an assault by a fellow inmate and failing to provide him with adequate dental care. He also asserts a state law negligence claim against Dr. St. Onge related to the dental claim. All defendants have moved for summary judgment. For the reasons discussed below, I grant defendants' motions with respect

to Carey's federal claims and dismiss without prejudice his state claims.

## I. BACKGROUND

### A. Prison Altercation and Dental Care

On March 16, 2003, Carey, a pretrial detainee at the HCDOC awaiting trial on nonviolent misdemeanor charges, was placed in a cell in general population Unit 2-C with Joshua "Robbie" Converse.  O'Mara Decl. at ¶ 7.  Aside from occasional "verbal exchanges," the two men resided in the cell together without incident for nearly three months.  Pl.'s Answers to Interrogatories ("Carey Interr.") at ¶ 2.  According to Carey, he "verbally asked several corrections officers for a cell change, [but] all responded, 'only for medical reasons.'"  Id. at ¶ 14. While confined in the cell on June 11, 2003, Converse "just flipped out" and punched Carey in the face and head approximately four times.  Id. at ¶ 10.  Carey was unable to defend himself and within a matter of seconds suffered injuries to his teeth and jaw, including broken and lost teeth.  Id. at ¶ 12.

At approximately 7:26 a.m. on that day, Corrections Officer Chad Pinciaro[1] was distributing breakfast in Unit 2-C when an inmate called him to Carey's cell.  O'Mara Decl. at ¶ 18. According to Pinciaro's June 11, 2003 report, he found Carey inside the cell holding pieces of his teeth in his hand and stating that he wanted to press charges against Converse for punching him in the face.  Id.  Pinciaro ordered Unit 2-C locked down, opened the cell, separated the two inmates and interviewed them individually.  Pinciaro called Sergeant Talbot, who quickly reported to the unit.  When Talbot arrived, Carey was transferred to Unit 1-A (adjacent to medical) and Converse was transferred to Unit 2-B, where he would await a hearing over the altercation.

Both inmates were seen separately by the prison nurse -- Carey in the medical unit, and Converse in Unit 2-B.  Id. at ¶ 19.  Carey exhibited slight swelling to the jaw area but no

---

[1] In his interrogatory responses, Carey refers to the first prison guard to respond to the cell following the altercation as "C.O. Iron Moccasin" with a parenthetical notation that "he's Native American."  Carey Interr. at ¶ 10, 13.  My review of both parties' papers suggests that Carey is, in fact, referring to C.O. Pinciaro.

-3-

Ecchymosis.[2]  Id. at ¶ 13.  He was given a bag of ice, Carey Interr. at ¶ 6, declined a prescription for Ibuprofen, St. Onge. Decl. at ¶ 19, and was returned to Unit 2-C following his visit with the nurse.  O'Mara Decl. ¶ 7, 20.  Converse remained in Unit 2-B.

On June 17, 2003, Carey submitted a medical request slip complaining of jaw pain.  Id.  On June 18, 2003, Carey was seen by Dr. Ward, an HCDOC contract physician, who ordered x-rays of Carey's jaw and Temporo-Mandibular Joint (TMJ).  According to Dr. Ward's report, the x-rays and examination revealed normal jaw alignment, no fractures, and some TMJ clicking.  St. Onge Decl. at ¶ 20.

On June 30, 2003, the HCDOC medical staff requested that Dr. St. Onge, an HCDOC contract dentist, examine Carey on an emergency basis.  Carey complained to Dr. St. Onge about injuries he suffered to his jaw and teeth during the altercation with Converse.  Aware of Dr. Ward's report, Dr. St. Onge visually examined Carey's mouth and jaw, physically manipulated his jaw,

---

[2] Ecchymosis: the escape of blood into the tissues from ruptured blood vessels.  Merriam-Webster's Online Dictionary, 10th ed.

-4-

palpated his facial bones, and listened to the movement of his jaw.  Dr. St. Onge observed no tooth loss, chipping, injury or damage that could, in his opinion, be attributed to the altercation with Converse, and he heard no clicking in Carey's TMJ.  St. Onge Decl. at ¶ 8-9.  Comparing dental x-rays of Carey's teeth on both the injured and uninjured sides of his jaw, Dr. St. Onge ruled out any traumatic fracture to the complained of area.  Id. at ¶ 12.

    Carey neither requested nor received any further dental or medical care for his jaw or teeth until he requested a dental cleaning nearly one year later.  Id. at ¶ 22.  On June 10, 2004, Dr. Henry Lemieux, Jr., performed the requested cleaning and reported only that he removed heavy plaque build-up from Carey's teeth.  Id.  According to Dr. Lemieux's treatment notes, Carey displayed a negative attitude towards the HCDOC dental staff, but did not complain of untreated broken teeth or jaw problems.  Id. at ¶ 23-24.  Carey was briefly released from prison from July 24 to August 1, 2004.  O'Mara Decl. at ¶ 13.  During his mandatory "pre-med" physical upon returning to the prison, Carey made no mention of any jaw pain or teeth problems.  Id.

On December 16, 2004, Carey submitted a medical request in which he complained of a popping jaw sound when eating.  Id. at ¶ 13.  On January 28, 2005, Carey submitted an Inmate Grievance Form in which he complained about his jaw and lack of medical treatment.

> I submitted a med slip at med call this morning.  On it, I informed the CNA that the jaw injury I suffered here OVER 1 ½ years ago (along with my broken teeth) and which has remained completed untreated, is getting progressively worse.  As a last resort, I told them I was going to stop eating if they didn't get my jaw repaired.  The CNA basically called me a liar and ridiculed me. The "nurse" (LPN?) actually threatened me with punishment and laughed in my face.  Neither had the slightest interest in helping me in any way!

O'Mara Decl. at ¶ 10; O'Mara Brief at 7.  This grievance (numbered 04-00477) was forwarded to the medical department and on February 1, 2005, Health Services Supervisor Denise Hartley, LPN, responded as follows:

> You were seen at the time of your original injury by both the doctor and the dentist.  X-rays of your jaw were done and showed no fractures or any misalignment of your jaw.  On 12/27/04 you submitted a sick slip and were placed on the dental list.  The last time prior to 12/27/04 you requested dental treatment was on 5/15/04 and you were seen 6/10/04.

Id.

On February 11, 2005, Carey was again seen by Dr. Lemieux, who detected some TMJ clicking and prescribed an anti-inflammatory treatment.  St. Onge Decl. at ¶ 26.  Carey indicated that he was not in pain on that day and Dr. Lemieux did not prescribe any pain control medication.  Id.  According to Carey, Dr. Lemieux told him that "the eventual solution for [his] misaligned jaw would be microsurgery by a specialist, if [he] were 'in a position to get that at some point.'"  Carey Interr. at ¶ 16.  On March 30, 2005, Carey reported to Dr. Ward that he had not benefitted from the anti-inflammatory treatment.  Dr. Ward recommended no further course of treatment.  St. Onge Decl. at ¶ 27.

During a July 7, 2005 physical examination, Carey complained about jaw problems but declined prescription offers for anti-inflammatory and/or pain control medications.  Id. at ¶ 29.  On September 22, 2005, Dr. Lemieux performed a dental cleaning.  His treatment notes lack any reference to complaints of jaw or tooth pain.  Id. at ¶ 30.

### B.   Converse's Background

The charges underlying Converse's various convictions and incarcerations include resisting arrest by flight, receipt of

stolen property, forgery, and misdemeanor possession of a controlled drug. O'Mara Decl. at ¶¶ 15-16. During prior periods of incarceration, Converse spent no time classified in any maximum level security or protected custody status, he had an earlier classification as an inmate worker, and he had expressed interest in attending counseling and religious study programs. Id. Classification Officer William Raymond assessed Converse's intake interview, criminal record, and prior history, and classified him at security level "5-Low-Medium" on a scale of 1-to-8, where "1. High" is the most secure and "8. Very Low" is the least secure. Id. at ¶ 17. Converse's only disciplinary charges during his incarceration at HCDOC stemmed from the June 11, 2003 altercation with Carey and one other incident in November 2003 resulting from his continued talking (despite being instructed to refrain) while the nurse on his unit performed her rounds. Id. at ¶ 23. During the three-month period during which Carey and Converse shared a cell, HCDOC received no complaints about Converse.

**C.   Inmate grievance procedure**

The HCDOC Inmate Handbook, which is provided to every inmate upon entry to the jail, sets forth the following inmate grievance

procedure:

> If you have a grievance concerning any matter related to your confinement, a grievance procedure is available to you.  The first step of the grievance procedure is informal resolution.  You must make a genuine attempt to seek an informal resolution of your problem with the staff member concerned.  The second step will normally be done in the Request Form format.  Fill out an Inmate Request Form stating your problem and suggested remedy, and submit it to your Unit Officer.  All request forms will be answered within seven (7) working days of receipt.  If you are dissatisfied with the response to your Request Form, you may file an Inmate Grievance Form to a Captain or his designee within 48 hours of receipt of your Request Form response.  The Captain or his designee has 15 working days from receipt to review your grievance and reply.  Decisions made by the County Correctional Facility's Hearings, or Classification Officer cannot be appealed through the grievance procedure. Grievances involving other agencies must be addressed directly to those agencies.

O'Mara Brief at 6 (citing Inmate Handbook 13-14).

According to O'Mara's sworn affidavit upon review of Carey's inmate file, Carey filed several dozen Request Forms during his incarceration.  O'Mara Decl. at ¶ 8.  None of these Request Forms sought a cell, housing unit, or other transfer based on concerns about his safety from other inmates.  Id.  The summary judgment record does not indicate whether any of Carey's Request Forms related to complaints about inadequate dental care.

-9-

In addition, Carey filed grievances as follows: 4/13/04 (law library access); 1/28/05 (non-treatment of a jaw injury suffered one-and-a-half years prior, as reprinted above); 7/7/05 (food); 7/29/05 (phone and legal mail access); 6/20/05-6/22/05 (advised of non-existent court date); and 2/1/06 (failure to treat a hernia).  Carey filed the instant suit on August 1, 2005, and amended the complaint in November 2005 and March 2006.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, I construe the evidence in the light most favorable to the nonmovant. Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

The party moving for summary judgment "bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317,

-10-

323 (1986).  Once the moving party has met its burden, the burden shifts to the adverse party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996).  The "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

### III.  ANALYSIS

Defendants first argue that they are entitled to summary judgment because Carey failed to exhaust his administrative remedies as required by the PLRA.  Carey contends that he has exhausted the available remedies but that he "has not been provided copies of all request slips and grievance forms submitted by himself or Mr. Converse prior to the 6/11/03 altercation, nor of all disciplinary reports on Converse."  Pl.'s Objection to O'Mara's Motion at ¶ 1.  Carey also argues that the

-11-

defendants' attorney "admits that Mr. Carey has met the 3 basic criteria of the PLRA's exhaustion requirement," id. at ¶ 2, and that Dr. St. Onge admitted that Carey filed numerous grievances regarding dental issues.  Pl.'s Objection to St. Onge's Motion at ¶ 3.[3]

Defendants alternatively argue that summary judgment must be granted even if Carey properly exhausted his administrative remedies because he cannot establish that the defendants acted with deliberate indifference to Carey's safety or dental needs.

---

[3] Carey also states the following:

> When Superintendent O'Mara is FINALLY brought to justice and incarcerated for the wrongful deaths of [several inmates] at his facility, Mr. Carey has no doubt, whatsoever, that O'Mara will spend the short time before he "P.C.'s" (goes into "protective custody" with child molesters), quivering in a fetal position under his bunk.  If O'Mara gets put in a cell with a sexual predator ("due to overcrowding," O'Mara's own usual excuse), and is homosexually raped five minutes after being locked in, hopefully O'Mara will have used that 5 minutes to submit all the necessary grievances, or the Honorable Court won't want to hear about it, because he "failed to exhaust all administrative remedies."

Pl.'s Objection to O'Mara's Motion at ¶ 4.  I take this statement as, among other things, Carey's disapproval of the PLRA's administrative exhaustion requirement, a point of view better addressed to Congress than this court.

In response, Carey contends that the prison knew or should have know about Converse's violent tendencies, and deliberately neglected to treat him for known tooth and jaw injuries which he suffered during his altercation with Converse.  I address each argument in turn.

### A. <u>Eight Amendment Failure to Protect Claim</u>

#### 1. <u>PLRA Administrative Exhaustion</u>

The Prison Litigation Reform Act of 1995 ("PLRA") provides, in relevant part, that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes."  <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002).  Because failure to exhaust PLRA remedies is an affirmative defense, defendants bear the initial burden of showing that an inmate failed to exhaust available remedies.  <u>See</u> <u>Casanova v. Dubois</u>, 304 F.3d 75, 77-78 (1st Cir. 2002).  A prisoner's failure to exhaust results in dismissal of the case.  <u>Medina-Claudio v.</u>

Rodriguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002) (Section 1997e(a) "clearly contemplates exhaustion prior to the commencement of the action as an indispensable requirement. Exhaustion subsequent to the filing of suit will not suffice").

Here, the administrative remedies available to Carey required that he take three steps prior to commencing the instant action: (1) attempt informal resolution, (2) file an Inmate Request Form, and (3) file an Inmate Grievance Form. Because there is nothing contradictory in the record, I accept Carey's assertion that he sought informal resolution of both the failure to protect and inadequate dental care claims. According to O'Mara's sworn affidavit based on his review of Carey's inmate file, Carey never filed a Request Form or Grievance Form either before or after the June 11 altercation in which he complained of problems with his cellmate, fear about his safety from other inmates, or requesting a cell transfer. Because he failed to do so, he has not exhausted his administrative remedies and he may not now pursue this claim in federal court.

2. Deliberate Indifference

Though I conclude that Carey failed to properly exhaust all administrative remedies for his failure to protect claim, I need

-14-

not rest my dismissal on that determination.  Assuming *arguendo* that Carey had properly exhausted this claim, I would grant summary judgment nonetheless.

The Eighth Amendment imposes "a duty . . . to protect prisoners from violence at the hands of other prisoners."  Farmer v. Brennan, 511 U.S. 825, 833 (1994) (citing Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988).  That duty, however, requires only that prison officials not be "deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners."  Burrell v. Hampshire County, 307 F.3d 1, 8 (1st Cir. 2002) (citing Farmer, 511 U.S. at 833).  In the context of an Eighth Amendment claim, deliberate indifference has two components.  See id.  "First, the deprivation alleged must be, objectively, sufficiently serious."  Id.  (citing Farmer, 511 U.S. at 834).  In a failure to protect claim such as this one, a plaintiff "must demonstrate that he was incarcerated under conditions imposing a substantial risk of serious harm." Id.  Second, a plaintiff must also show that the defendants had a sufficiently culpable state of mind, described as "deliberate indifference" to an inmate's health or safety.  Farmer, 511 U.S. at 834.

-15-

A prison official acts with deliberate indifference to an inmate's health or safety only if he is "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [] also draw[s] that inference." Id. The First Circuit, among others, has likened this requirement to "the standard for determining criminal recklessness." Giroux v. Somerset County, 178 F.3d 28, 32 (1st Cir. 1999) (internal citations omitted).  Thus, Carey must show that the defendants knew of a substantial risk of serious harm and disregarded that risk.  Calderon-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002) (citing Farmer, 511 U.S. at 835-840).

Here, the record contains insufficient evidence from which to infer that Converse presented a substantial safety risk or that the defendants subjectively disregarded any such risk. Carey's only assertion to the contrary is his conclusory statement that "Converse had a long history of violence, felonies, 'state pen' time, etc," Compl. at Allegation 1, and that Converse engaged in "fanatical weightlifting" while incarcerated.  Pl.'s Objection to O'Mara's Motion at ¶ 3.  The only other evidence on this point is provided by defendants in sworn affidavits describing Converse's inmate file, which contain

insufficient suggestion of violent tendencies or risk to fellow inmates. Based on the evidence in the present record, I conclude that defendants had no objective basis to believe that Converse posed a substantial threat to Carey. Accordingly, I grant defendants' motion for summary judgment on Carey's failure to protect claim.

**B.    Eight Amendment Inadequate Dental Care Claim**

    1.   PLRA Administrative Exhaustion

The record of complaints regarding Carey's dental claims is somewhat ambiguous. While O'Mara states that Carey filed dozens of Request Forms and that none of them relate to his *failure to protect claim*, he does not specifically state that Carey failed to submit a Request Form regarding his *dental claim*. Furthermore, I find that Carey's January 28, 2005 grievance satisfied the final exhaustion requirement. Because defendants bear the initial burden of showing failure to exhaust and they have not done so here, I cannot grant summary judgment on these grounds.

    2.   Deliberate Indifference

Claims by pretrial detainees alleging denials of medical or

dental assistance turn on whether the challenged official action constituted "deliberate indifference" to a serious medical need. See Mahan v. Plymouth County House of Corrs., 64 F.3d 14, 17-18 (1st Cir. 1995) (medical care); Hammer v. Saffle, No. 91-7038, 1991 WL 261652, *5 (10th Cir. 1991) (dental care). As above, the test in this context "has both an objective component (was there a sufficiently serious deprivation?) and a subjective component (was the deprivation brought about in wanton disregard of the inmate's rights?)." Desrosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991) (citing Wilson v. Seiter, 501 U.S. 294 (1991)). Thus, Carey "must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain." Mahan, 64 F.3d at 19.

It is clear from the record that defendants did not act with deliberate indifference to Carey's dental needs. He was seen by the prison nurse immediately following the altercation with Converse on June 11, 2003. He received ice to treat the swelling and declined an offer for Ibuprofen at that time. On June 18, 2003, he was seen by Dr. Ward, who examined him, took x-rays of his jaw, and concluded that Carey's jaw alignment was normal and

no fractures had occurred.  On June 30, 2003, Carey was seen by Dr. St. Onge, who thoroughly examined Carey and analyzed x-rays. Although Dr. St. Onge observed no tooth loss or damage that, *in his opinion*, could be attributed to the altercation, this difference of opinion does not change the result.  <u>See Herl v. Gamble</u>, 124 Fed. Appx. 630, 631 (10th Cir. 2005) (a plaintiff's difference of opinion with the medical judgment of a prison doctor is insufficient to support an Eighth Amendment claim); <u>Perkins v. Kansas Dep't of Corrs.</u>, 165 F.3d 803, 811 (10th Cir. 1999) (stating that "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation").

   Carey next sought a dental cleaning almost a year later and promptly received one in June 2004.  Following his next dental request in December 2004 and Inmate Grievance in January 2005, Carey again received treatment, including a dental exam and anti-inflammatory prescription.  While it is true that Carey did not receive jaw re-alignment surgery as requested, it is convincingly clear in this case that defendants have not acted with anything remotely near deliberate indifference.  Accordingly, defendants'

motions for summary judgment on Carey's dental claims are granted.[4]

## IV. CONCLUSION

For the reasons set forth above, defendants' Motions for Summary Judgment (Doc. Nos. 42 and 44) are granted. The clerk is instructed to enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

August 29, 2007

cc:  William J. Carey, pro se
     John Curran, Esq.
     Ralph Suozzo, Esq.

---

[4] Because I dismiss Carey's federal claims, I decline to exercise supplemental jurisdiction over his state law negligence claim and dismiss it without prejudice.